IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GEENA DICAPRIO,<br>*Plaintiff,*<br>v.<br>UNITED UNION OF ROOFERS, WATERPROOFERS, AND ALLIED WORKERS, LOCAL NO. 37, *et al.*,<br>*Defendants.* | Civil Action No. 2:25-cv-1789<br>Hon. William S. Stickman IV |

**OPINION**

WILLIAM S. STICKMAN IV, United States District Judge

Before a plaintiff can avail herself of the remedies afforded by federal antidiscrimination law, she must first clear a number of technical hurdles. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, contains two such hurdles: an employee-numerosity requirement and an administrative-exhaustion requirement. Both are central to this case. Geena DiCaprio ("DiCaprio") brings claims under Title VII, the Pennsylvania Human Relations Act, 43 Pa. C.S. § 951, *et seq.*, ("PHRA), and Pennsylvania common law against the United Union of Roofers, Waterproofers, and Allied Workers, Local No. 37 ("Local 37"), the United Union of Roofers, Waterproofers, and Allied Workers ("International Union"),[1] and Local 37's business manager, Scott Porter ("Porter").[2] These claims are based on the sexual harassment that DiCaprio experienced while working as Local 37's officer manager alongside Porter.

[1] Although the Amended Complaint refers to the United Union of Roofers, Waterproofers, and Allied Workers as the "National Union," the Court will refer to it as the "International Union."

[2] At Count I, DiCaprio asserts claims for violations of Title VII and the PHRA against both Local 37 and the International Union, alleging a hostile work environment and gender discrimination.

Before the Court are two motions. Local 37 and Porter filed a partial motion to dismiss counts I, II, IV, and V pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 37). The International Union filed its own motion to dismiss counts I, II, and V under Federal Rule of Civil Procedure 12(b)(6). (ECF No. 35). With respect to Local 37, DiCaprio has not adequately pled that Local 37 has the requisite number of employees to satisfy Title VII's employee-numerosity requirement. The Court notes that DiCaprio has pled enough to show that the employees of Local 37 and the International Union could be combined under an "integrated enterprise" theory for purposes of meeting that requirement. Nevertheless, her claims against Local 37 will be dismissed without prejudice, as she has not alleged that the International Union satisfies the employee-numerosity requirement, or even that Local 37 and the International Union satisfy this requirement in combination. DiCaprio will be given leave to amend her pleading.

With respect to the International Union, DiCaprio failed to comply with Title VII's administrative-exhaustion requirement. Specifically, she failed to name the International Union as a party in the presuit administrative proceedings required by Title VII. Based on the limited facts before the Court, no exception applies to excuse that failure. Furthermore, DiCaprio's claim against the International Union is untimely, as she filed her Amended Complaint in Civil Action ("Amended Complaint") outside the ninety-day window established by Title VII. Based on the facts before the Court, the Amended Complaint does not relate back to the filing date of DiCaprio's original pleading. Accordingly, her claims against the International Union will dismissed without

---

(ECF No. 16, p. 14). At Count II, DiCaprio asserts claims for violations of Title VII and the PHRA against both Local 37 and the International Union, alleging retaliation. (*Id.* at 21). At Count III, DiCaprio asserts a claim for battery under Pennsylvania common law against Porter. (*Id.* at 24). At Count IV, DiCaprio asserts a claim for assault under Pennsylvania common law against Porter. (*Id.* at 26). At Count V, DiCaprio asserts a claim for negligent supervision under Pennsylvania common law against both Local 37 and the International Union. (*Id.* at 27).

prejudice. DiCaprio will be given leave to amend her pleading to further explore whether her failure to name the International Union should be excused, as well as whether the Amended Complaint relates back to the filing date of her original pleading.

Because all of DiCaprio's federal-law claims will be dismissed, the Court will decline to exercise supplemental jurisdiction over her remaining state-law claims.

## I. Factual Background

DiCaprio began her employment with Local 37 as an "office manager/executive assistant" in March 2020, and reported for work to Local 37's office in Westmoreland County, Pennsylvania. (ECF No. 16, ¶¶ 43—45). From March 2020 to July 2024, DiCaprio worked under John Flat, Local 37's business manager. (*Id.* ¶ 47). In July 2024, Porter took over the role of business manager and became DiCaprio's new supervisor. (*Id.* ¶ 48). From that point onward, DiCaprio was subjected to a "severe and pervasive campaign of sexual harassment" by Porter, (*id.* ¶ 49), which ranged from inappropriate comments about DiCaprio's breasts to spreading a rumor about DiCaprio's marital infidelity, and acts of physical aggression, (*id.* at 10—11). The timeline is as follows:

- In August 2024, Porter told DiCaprio that she had "nice boobs" after seeing her at a union-hosted waterpark event the previous weekend. (*Id.* ¶ 50).
- On September 2, 2024, at a Labor Day parade, Porter asked DiCaprio what t-shirt size she wore, and told her that her "boobs" were "too big for a small." (*Id.* ¶ 51).
- In the fall of 2024, Porter spread a false rumor in the organization that DiCaprio had been "unfaithful to her husband by engaging in a sexual relationship with a male colleague." (*Id.* ¶ 52).

- On October 14, 2024, Porter sent DiCaprio a Facebook message with a "kissing face" emoji and a "middle finger" emoji. (*Id.* ¶ 53).
- In November 2024, at a union event, Porter "physically accosted" DiCaprio by "inappropriately grabbing her hips." (*Id.* ¶ 54). This incident was witnessed by Nathan Henry. (*Id.*).
- On January 21, 2025, while DiCaprio was showing Porter something on a computer, Porter "physically assaulted [her] by shoving his face into her breasts." (*Id.* ¶ 55).
- On January 28, 2025, Porter "attempted to implement a new policy" that would have prevented DiCaprio from working remotely. (*Id.* ¶ 56). Porter's stated reason for this policy was that he "should have a secretary that [he could] fuck." (*Id.* ¶ 57). Apprentice Mark Locke ("Locke") overheard this comment. (*Id.*).

DiCaprio took steps to report this harassment on several occasions. In September 2024, following Porter's initial comments, DiCaprio made a report to "[Intern]ational Union's then-Vice President" Michael Kujawa ("Kujawa"). In response, Kujawa dismissed DiCaprio's concerns, telling her that Porter was "just messing with [her]" and "[h]e's new, you'll be okay." (*Id.* ¶¶ 58—59).

Following the two January incidents, DiCaprio complained to Mike Vasey ("Vasey"), a member of the International Union's executive board. (*Id.* ¶ 60). In response, Vasey texted DiCaprio the following message: "Don't lose your cool just continue to do your job and let us work on this!" (*Id.* ¶ 61). He also told her that if she felt ill as a result of Porter's conduct, she should "try to finish your day but if you're ill and need to go home make sure you advise Scott [Porter] of your illness." (*Id.* ¶ 62) (alteration in original).

From January 2025 until her resignation in June 2025, DiCaprio also experienced harassment and retaliation from others in the office as a result of her complaints. (*Id.* at 12—13). Her Amended Complaint details those incidents as follows:

- The "Union Defendants' 'Executive Board'" released the name of Nathan Henry in violation of protocol. (*Id.* ¶ 65). Nathan Henry had earlier witnessed and reported the November 2024 incident where Porter grabbed DiCaprio's hips. (*Id.* ¶ 54). Porter retaliated against Nathan Henry for his complaint by "informing him that he could no longer work on a crew with women because he 'should not have said anything.'" (*Id.* ¶ 66).
- John Demko ("Demko"), a member of Local 37's executive board, began harassing DiCaprio with excessive phone calls to her personal cellphone. (*Id.* ¶ 67).
- Bryan Henry, Local 37's president, threatened termination for anyone on his work crew who associated with DiCaprio. (*Id.* ¶ 68).
- Michael Hensen ("Hensen"), a union member, harassed DiCaprio about bringing her children into the office and sent her threatening text messages. (*Id.* ¶¶ 69—70).

In June 2025, DiCaprio raised her concerns with Vasey and Kujawa one last time, citing the "Defendant's own Collective Bargaining Agreement sections on 'human rights' and 'sexual harassment.'" (*Id.* ¶ 71). In response, "the [Intern]ational Union, via its Executive Board," told DiCaprio that she had "no rights" because she was not a member of the union. (*Id.* ¶ 72). DiCaprio resigned on June 17, 2025. (*Id.* ¶ 73—74).

On August 14, 2025, prior to commencing this action, DiCaprio dually filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC"). (*Id.* ¶ 35(a)). On August 29, 2025, the

EEOC issued DiCaprio a Notice of Right to Sue ("RTS Notice"), providing her with ninety days to bring suit. (*Id.* ¶ 35(b)); (ECF No. 16-1). The RTS Notice lists Local 37 as the sole respondent. (ECF No. 16-1). DiCaprio filed her initial complaint on November 18, 2025, naming Local 37 as the sole defendant. (ECF No. 1). DiCaprio later amended her complaint to add the International Union and Scott Porter as defendants. (ECF No. 16).

## II. Standard of Review

A motion to dismiss filed under Federal Rule of Civil Procedure ("Rule") 12(b)(6) tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). A plaintiff must allege sufficient facts that, if accepted as true, state a claim for relief plausible on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court must accept all well-pleaded factual allegations as true and view them in the light most favorable to a plaintiff. *See Doe v. Princeton Univ.*, 30 F.4th 335, 340 (3d Cir. 2022); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). Although a court must accept the allegations in the complaint as true, it is "not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (citations omitted).

The "plausibility" standard required for a complaint to survive a motion to dismiss is not akin to a "probability" requirement but asks for more than sheer "possibility." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). In other words, the complaint's factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations are true even if doubtful in fact. *Twombly*, 550 U.S. at 555. Facial plausibility is present when a plaintiff pleads factual content that allows the court to draw the reasonable inference that a defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678. Even if the

complaint's well-pleaded facts lead to a plausible inference, that inference alone will not entitle a plaintiff to relief. *Id.* at 682. The complaint must support the inference with facts to plausibly justify that inferential leap. *Id.*

Generally, a court may not consider an extraneous document when reviewing a motion to dismiss. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). If parties present matters outside the pleadings and the court does not exclude them, the motion must be converted to a motion for summary judgment. *See* Fed. R. Civ. P. 12(d). When reviewing the sufficiency of a complaint, however, a court may consider attachments to it without converting the motion into one for summary judgment if they are integral to the allegations in the complaint and are authentic. *See In re Burlington*, 114 F.3d at 1426 (holding that a court may consider a "document integral to or explicitly relied upon in the complaint"); *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994) (same); *Fallon v. Mercy Cath. Med. Ctr. of Se. Pa.*, 877 F.3d 487, 493 (3d Cir. 2017) (same); Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *see also Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (holding that a court may consider an "undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document").[3]

---

[3] With the exception of the RTS Notice attached to DiCaprio's Amended Complaint, *see infra* note 13, the Court declines to consider any of the other materials offered by the parties at this stage of the litigation. Local 37 urges the Court to consider its constitution and bylaws, its Form LM-2 for the year 2024, the collective bargaining agreement between Local 37 and its signatory contractors, and the International Union's "Statement of Personal and Professional Standards of Conduct for Officers." (ECF No. 38-1). The International Union urges the Court to consider its constitution and bylaws, as well as its Form LM-2 for the years 2024 and 2025. (ECF Nos. 36-2, 36-3, 36-4).

## III. ANALYSIS

### A. DiCaprio's Title VII Claims Against Local 37

At Counts I and II of the Amended Complaint, DiCaprio brings claims for violations of Title VII against Local 37. For the reasons discussed below, Local 37's motion to dismiss those claims will be granted. DiCaprio has failed to allege that Local 37 satisfies Title VII's employee-numerosity requirement. Though she has plausibly alleged that the employees of Local 37 can be combined with the employees of the International Union under an "integrated enterprise" theory to satisfy that requirement, she has failed to allege that the International Union—either individually or in combination with Local 37—satisfies that requirement.[4] In light of that defect, DiCaprio will be given leave to amend her pleading.

#### *1. Local 37 Does Not Satisfy Title VII's Employee-Numerosity Requirement.*

Title VII of the Civil Rights Act of 1964 prohibits "employer[s]" from discriminating on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).[5] The statute defines an "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." *Id.* § 2000e(b). A person employing fewer than fifteen employees is not subject to the requirements of Title VII. *Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202,

---

[4] The question of whether Local 37 and the International Union can be combined for purposes of establishing that Local 37 meets the employee-numerosity requirement is analytically distinct from the question of whether the International Union should be a defendant in this action. That second question will be discussed below in Section III.B.

[5] Because DiCaprio is suing Local 37 in its capacity as an employer, the employee-numerosity requirement applies. *See Dean v. Am. Fed'n of Gov't Emps., Loc. 476*, 509 F. Supp. 2d 39, 52 n.9 (D.D.C. 2007).

205 (1997). This "employee-numerosity requirement" is a substantive element of a Title VII plaintiff's claim for relief, rather than a limit on subject-matter jurisdiction. *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 504 (2006).

Title VII defines an "employee" as "an individual employed by an employer." 42 U.S.C. § 2000e(f). That definition, which applies across various pieces of federal antidiscrimination legislation,[6] has been described by the United States Supreme Court as a "mere 'nominal definition' that is 'completely circular and explains nothing.'" *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 444 (2003) (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992)). Most of the time, the "payroll method" can tell you how to find a business's employees:

> [T]he test for when an employer "has" an employee is no different from the test for when an individual *is* an employee: whether the employer has an employment relationship with the individual on the day in question. This test is generally called the "payroll method," since the employment relationship is most readily demonstrated by the individual's appearance on the employer's payroll.

*Walters*, 519 U.S. at 206.

However, "an individual who appears on the payroll but is not an 'employee' under traditional principles of agency law would not count toward the 15–employee minimum." *Id.* at 211 (internal citation omitted). For example, "directors or board members … [are] traditionally viewed as employers, [but] can be considered employees depending upon their responsibilities within the business." *Kern v. City of Rochester*, 93 F.3d 38, 47 (2d Cir. 1996); *see also Ponchek v. Johnstown-Cambria Cnty. Airport Auth.*, No. CIV. A. 98–179J, 1999 WL 370706, at *2 (W.D. Pa. Apr. 7, 1999) ("It is a matter of basic hornbook law that a director is not ordinarily an employee.

---

[6] *See* 42 U.S.C. § 12111(4) (Americans with Disabilities Act); 29 U.S.C. § 630(f) (Age Discrimination in Employment Act).

On the other hand, to the extent that any officer or director is *also* a bona-fide employee, his or her status as an officer or director is irrelevant. Such a person will be counted according to his or her status as an employee." (cleaned up)).

In *Clackamas*, the Supreme Court analyzed whether a shareholder-director of a professional corporation was an "employee" for purposes of meeting the employee-numerosity requirement of the Americans with Disabilities Act. 538 U.S. at 441—42. To make that determination, the Court looked to "the conventional master-servant relationship as understood by common-law agency doctrine," *id.* at 445 (quoting *Darden*, 503 U.S. at 322—23), using the "common-law element of control [as] the principal guidepost," *id.* at 448. The Court adopted a six-factor test from the EEOC designed to assess whether "partners, officers, members of boards of directors, and major shareholders qualify as employees." *See id.* at 448—50. Those six factors are as follows:

> Whether the organization can hire or fire the individual or set the rules and regulations of the individual's work; Whether and, if so, to what extent the organization supervises the individual's work; Whether the individual reports to someone higher in the organization; Whether and, if so, to what extent the individual is able to influence the organization; Whether the parties intended that the individual be an employee, as expressed in written agreements or contracts; Whether the individual shares in the profits, losses, and liabilities of the organization."

*Id.* at 449—50 (cleaned up).

The United States Court of Appeals for the Third Circuit has applied this six-factor test, with minor variations, to other business entities in the Title VII context. *See Mariotti v. Mariotti Bldg. Prods., Inc.*, 714 F.3d 761, 767 (3d Cir. 2013). However, the Third Circuit has not applied the *Clackamas*/*Mariotti* factors to union officers or union executive-board members, and other courts continue to apply agency-law factor tests in the union context without referencing *Clackamas*. *See, e.g.*, *Frederick v. United Bhd. of Carpenters & Joiners of Am. (UBCJA) Loc.*

*296*, 558 F. App'x 83, 85 (2d Cir. 2014) ("In assessing whether a higher-level executive has assumed duties that make him or her an employee for purposes of the anti-discrimination laws, we have applied a three-factor test: (1) whether the [executive] has undertaken traditional employee duties; (2) whether the [executive] was regularly employed by a separate entity; and (3) whether the [executive] reported to someone higher in the hierarchy." (alterations in original) (citing *EEOC v. Johnson & Higgins, Inc.*, 91 F.3d 1529 (2d Cir. 1996))).

Despite the ambiguity as to which test applies, the Court views the *Clackamas/Mariotti* factors as a helpful guide in the context of union leadership and these motions in particular. After all, the Third Circuit has stated that these factors apply across contexts, *see Mariotti*, 714 F.3d at 767, and courts apply the factors in a variety of nontraditional contexts, *see, e.g.*, *Fain v. Twin Lakes Reg'l Sewer Dist.*, 712 F. Supp. 3d 1134, 1138—41 (N.D. Ind. 2024) (applying *Clackamas* to the board of trustees of a municipal corporation responsible for water treatment).

Regardless of the exact framework, courts have repeatedly held that union officers and members of union executive boards do not qualify as employees unless their day-to-day role in the organization makes them so. *See Kern*, 93 F.3d at 47 (holding that nonofficer local union executive board members were not employees when they did not "perform[] any traditional employee duties, such as maintaining records or managing the office," and were not "responsible to anyone but themselves"); *Jackson v. Int'l Bhd. of Teamsters, Loc. Union No. 705*, No. 02 C 2745, 2002 WL 31572544, at *4 (N.D. Ill. Nov. 18, 2002) (finding that member of union executive committee was an "employee" entitled to invoke the protections of Title VII where he alleged, among other things, that he was "directly involved in the Union's daily operations").

Of course, union officers and board members—just like corporate officers and board members—can still be employees provided they play the right sort of organizational role. *See,*

*e.g.*, *Frederick*, 558 F. App'x at 85 (finding material issues of fact as to whether local union officers were "employees" where the record showed they "were responsible for the daily operations of [the local union]" and were supervised by the local union's president in various ways). And an "officer" title is not conclusive. *See Mariotti*, 714 F.3d at 767. But a plaintiff must overcome what is effectively a presumption that these individuals are not employees. *See, e.g.*, *Kern*, 93 F.3d at 47 ("In the present case, [the plaintiff] *fails to demonstrate* that a traditional employee-employer relationship existed between the eight non-officer board members and Local 1071." (emphasis added)).

Here, DiCaprio fails to plausibly allege that Local 37 satisfies Title VII's employee-numerosity requirement. Her Amended Complaint is devoid of any reference to Title VII's employee-numerosity requirement generally, or to the number of individuals in Local 37's employ specifically; furthermore, her references to various individuals affiliated with Local 37 or the International Union are insufficient to make up for that lack of explicit pleading. *See, e.g.*, *Zang v. W. Pa. Teamsters & Emp. Welfare Fund*, Civil Action No. 14–1651, 2015 WL 3948243, at *2 (W.D. Pa. June 29, 2015) ("Plaintiff makes no reference to the number of employees employed by Defendant, or plead any facts from which it can reasonably be inferred that Defendant was an 'employer' as defined by the relevant statutes. In sum, Plaintiff's allegations are simply insufficient to state a claim under the ADA, FMLA or Title VII.").

To be clear, the pleading bar for Title VII's employee-numerosity requirement is not high. For example, one of our sister courts found sufficient a simple allegation that the defendant "had fifteen (15) or more employees for each working day in each of twenty (20) or more calendar weeks in the [relevant years]." *Koch v. Early Impressions Learning Ctr., LLC*, CIVIL ACTION NO. 1:24-CV-549, 2024 WL 4555398, at *3 (M.D. Pa. Oct. 23, 2024) (alteration in original)

(citation omitted); *see also Gonzalez v. Busy Place Early Learning Ctr.*, Civ. No. 14–6379(KM), 2015 WL 5679887, at *3—4 (D.N.J. Sep. 25, 2015) (discussing similar cases). The *Koch* court noted that the "allegation, although tied to the statutory language, [was] factual, not legal." *Koch*, 2024 WL 4555398, at *3 ;*cf. Martinez v. UPMC Susquehanna*, 986 F.3d 261, 267 (3d Cir. 2021) (clarifying that an age-discrimination plaintiff's allegation that his replacement was "significantly younger" was a factual allegation sufficient to meet the plausibility standard). But a plaintiff's claim must fail when they make "no reference to the number of employees employed by [the defendant], or [fail to] plead any facts from which it can reasonably be inferred that [the defendant] was an 'employer' as defined by the relevant statutes." *Zang*, 2015 WL 3948243, at *2.

Apart from Porter and DiCaprio, the Amended Complaint references eight individuals. These individuals are:

- John Flat, who served as Local 37's business manager prior to Porter taking over in July 2024. (ECF No. 16, ¶¶ 47, 48).
- Nathan Henry, the individual who witnessed Porter grab DiCaprio's hips in November 2024, and reported the incident. While the Amended Complaint is unclear on Nathan Henry's role in Local 37, he appears to be a worker represented by Local 37—rather than an employee of Local 37—given the Amended Complaint's later reference to his work on a "crew." (*Id.* ¶¶ 54, 65—66).
- Mark Locke, an "apprentice" who overhead Porter's comment about wanting to be able to "fuck" his secretary. (*Id.* ¶ 57).
- Michael Kujawa, a vice president of the International Union at the time of DiCaprio's initial complaint in September 2024. (*Id.* ¶¶ 58—59).

- Mike Vasey, a member of the International Union's executive board at the time of DiCaprio's January 2025 complaint. (*Id.* ¶¶ 60—62).
- John Demko, a member of Local 37's executive board who placed "excessive" phone calls to DiCaprio at some point between January 2025 and DiCaprio's resignation in June 2025. (*Id.* ¶ 67).
- Bryan Henry, the president of Local 37, who forbid his work crew from associating with DiCaprio in retaliation for her reports of Porter's conduct. (*Id.* ¶ 68).
- Michael Hensen, a "member" of Local 37 who harassed DiCaprio for bringing her children into the office and sent her threatening texts. (*Id.* ¶¶ 69—70).

Assuming that all of these individuals—plus Porter and DiCaprio—are employees of Local 37, then Local 37 had *at most* ten employees, which falls short of Title VII's fifteen-employee requirement.

Putting that number aside, DiCaprio's allegations fail on another basis. She does not allege that any of these individuals—apart from herself, Porter, and possibly Flat, (*e.g.*, *id.* ¶¶ 4, 10, 47, 48)—are employees of Local 37. Nathan Henry, Locke, and Hensen all appear to be workers represented by Local 37. Kujawa, Vasey, Demko, and Bryan Henry are described as either officers or executive-board members (and Kujawa and Vasey are described as being affiliated with the International Union, not Local 37). As discussed above, the law effectively presumes that union officers and executive-board members are not employees absent specific allegations to the contrary. *See, e.g.*, *Kern*, 93 F.3d at 47 ("In the present case, [the plaintiff] *fails to demonstrate* that a traditional employee-employer relationship existed between the eight non-officer board members and Local 1071." (emphasis added)).

Regardless of which formulation of the common-law test is used, DiCaprio has failed to allege facts that speak to the role of Local 37's officers or executive-board members. The Amended Complaint does not, for example, speak to the degree of supervision Local 37 exercises over its officers or board members, whether the officers or board members report to any higher-ups, the degree to which Local 37's officers or board members are capable of influencing the organization, or whether there are any written agreements or contracts characterizing the relationship between Local 37 and these individuals. *See Mariotti*, 714 F.3d at 765—66. With no allegations to speak to those factors, the Court has no basis to draw any inferences in DiCaprio's favor as to the status of these individuals.

DiCaprio relies on *Arbaugh v. Y & H Corp.*, 546 U.S. 500 (2006), in support of her argument that the employee-numerosity question is better resolved at summary judgment, (ECF No. 41, p. 6). That reliance is misplaced. In *Arbaugh*, the Supreme Court clarified that Title VII's employee-numerosity requirement is an element of a plaintiff's claim for relief rather than a jurisdictional requirement. 546 U.S. at 504. DiCaprio references this, noting that "[s]ince *Arbaugh*, Pennsylvania district courts regularly deny motions to dismiss [on the basis of Title VII's employee-numerosity requirement], holding that the number of employees employed by a defendant is a question of fact which is better left for a motion for summary judgment." (ECF No. 41, p. 6 (citing cases)).

While this assertion might be true, *Arbaugh* does not alter a plaintiff's obligation to plausibly allege the existence of fifteen or more employees. Where, as here, a plaintiff fails to allege *any* facts that plausibly suggest the employee-numerosity requirement is met, a Title VII claim must fail. The cases cited by DiCaprio confirm this. *See, e.g.*, *Gustovich v. St. Clair Hosp., Inc.*, No.

2:07-cv-1670, 2008 WL 1840747, at *1 (W.D. Pa. Apr. 23, 2008) ("The complaint adequately alleges that Keystone is an 'employer' subject to Title VII.").

Because DiCaprio has not sufficiently alleged that Local 37 satisfies the employee-numerosity requirement, it is necessary for the Court to consider whether DiCaprio has plausibly alleged that Local 37 and the International Union are an "integrated enterprise" such that their employees can be combined to satisfy the employee-numerosity requirement with respect to Local 37.

***2. Although DiCaprio Has Plausibly Alleged That Local 37 and the International Union Can Be Combined as an "Integrated Enterprise" to Satisfy Title VII's Employee-Numerosity Requirement, She Has Not Plausibly Alleged That the International Union Has Enough Employees—Either Individually or in Combination with Local 37—to Satisfy That Requirement.***

Because DiCaprio has not plausibly alleged that Local 37 satisfies Title VII's employee-numerosity requirement, her ability to sue will turn on whether the employees of Local 37 (whoever they might be) can be combined with the employees of the International Union under an "integrated enterprise" theory. Since DiCaprio does not allege that the International Union meets the employee-numerosity requirement either individually or in combination with Local 37, her Title VII claims against Local 37 will be dismissed, and she will be given leave to amend her pleading. *See, e.g.*, *Zang*, 2015 WL 3948243, at *2 (dismissing a Title VII claim for failure to plead that defendant satisfied the employee-numerosity requirement). However, given the fact-intensive nature of the integrated-enterprise inquiry and the need for discovery to fully understand the relationship between Local 37 and the International Union, DiCaprio has pled enough to survive a motion to dismiss on that issue alone. She can explore this theory at a later date provided she is able to successfully amend her pleading.

In her Amended Complaint, DiCaprio alleges that Local 37 and the International Union are an integrated enterprise. (ECF No. 16, ¶¶ 36—42). Her theory revolves around three central allegations:

- "The [Intern]ational Union regularly sends representatives to Local No. 37's office, oversees its operations, participates in its investigations, and governs its status as a local chapter of the [Intern]ational Union." (*Id.* ¶ 39).
- "The [Intern]ational Union maintains a 'Statement of Personal and Professional Standards of Conduct for Officers,' which sets forth specific standards of conduct applicable to officers of the [Intern]ational Union, its affiliated Local Unions and District Councils." (*Id.* ¶ 40).
- "The [Intern]ational Union exercises administrative, operational, and financial control over Local No. 37 by: (i) requiring conformity with the [Intern]ational Union's Constitution and Bylaws; (ii) governing the supervision of Local No. 37's officers and their conduct; (iii) retaining authority to bring, hear, and decide charges against Local No. 37's officers and members; (iv) hearing appeals arising from the disposition of a charge carried out by Local No. 37; (v) retaining authority to merge or close Local No. 37 for nonconformity; and (vi) claiming and obtaining title to all property and assets of Local No. 37 in the event of dissolution." (*Id.* ¶ 41).

In her briefing, DiCaprio further supports her "integrated enterprise" theory by referencing the International Union's role in the investigation of Porter's conduct. (ECF No. 41, pp. 8—9). Following the two January incidents with Porter, DiCaprio complained to Vasey, a member of the International Union's executive board. (ECF No. 16, ¶¶ 60—62). DiCaprio cites Vasey's "unambiguous" statement to her to "let [the National Union] work on this," (ECF No. 41, p. 8)

(alteration in original) (citing (ECF No. 16, ¶ 61)),[7] as evidence that the International Union "would not only investigate the allegations, but take appropriate remedial measures to discipline" Porter, (*id.*). DiCaprio further argues that Vasey's remark should be understood in light of the International Union's constitution, bylaws, and Statement of Personal and Professional Standards of Conduct for Officers, which collectively provide for the possibility of Porter's removal by the International Union and the closure of Local 37 for failure to adhere to certain standards. (*Id.* at 8—9).

Under an "integrated enterprise" theory, a plaintiff whose "employer" in the colloquial sense falls short of Title VII's fifteen-employee minimum might argue that the employees of some *other* entity—e.g., a parent company—should count toward that total. Prior to the Third Circuit's decision in *Nesbit v. Gears Unlimited, Inc.*, 347 F.3d 72 (3d Cir. 2003), courts in this circuit and across the country applied a four-prong test from the National Labor Relations Board ("NLRB") to assess whether two entities should be deemed an "integrated enterprise" or "single employer"[8] for purposes of Title VII's employee-numerosity requirement. *See, e.g.*, *Switalski v. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, Loc. Union No. 3*, 881 F. Supp. 205, 207—08 (W.D. Pa. 1995); *see also Nesbit*, 347 F.3d at 84 (collecting cases). This test was originally "designed to determine whether the NLRB may decide a particular labor dispute" in the context of the National Labor Relations Act ("NLRA"). *Id.* at 85. "The four factors of the NLRB test are '(1) interrelation of operations, (2) common management, (3) centralized control of labor relations,

---

[7] Local 37 points out that DiCaprio's brief substitutes "the National Union" in brackets for "us" in the Amended Complaint. (ECF No. 43, pp. 4—5).

[8] This doctrine is distinct from the "joint employer" doctrine. *See Myers v. Garfield & Johnson Enters., Inc.*, 679 F. Supp. 2d 598, 607—11 (E.D. Pa. 2010) (clarifying the difference between the "joint employer" and "single employer" theories).

and (4) common ownership or financial control.'" *Id.* at 84 (quoting *Artis v. Francis Howell N. Band Booster Ass'n*, 161 F.3d 1178, 1184 (8th Cir. 1998)).

In *Nesbit*, the Third Circuit reassessed the wisdom of applying the NLRB test in the employment-discrimination context, reasoning that the NLRA-origins of the test rendered it ill-suited for dealing with the distinct policy goals of Title VII. *See id.* at 85. Specifically, the court noted that the broad sweep of the NLRB test was inconsistent with the rationale behind Title VII's employee-numerosity requirement, which was intended to shield small businesses from the statute's daunting compliance regime. *See id.*

Building on a framework engineered by the Seventh Circuit in *Papa v. Katy Industries, Inc.*, 166 F.3d 937 (7th Cir. 1999), the *Nesbit* court identified three circumstances in which two entities might be deemed an integrated enterprise:

> We … will consider a company and its affiliates a single employer under Title VII (1) when a company has split itself into entities with less than fifteen employees intending to evade Title VII's reach or (2) when a parent company has directed the subsidiary's discriminatory act of which the plaintiff is complaining. However, on the third part of this disjunctive test, we articulate a slightly different standard from the Seventh Circuit. Rather than applying the test for veil piercing imported from the corporation law context (because individual shareholder liability is not implicated here), we will apply the factors courts use to determine when substantively to consolidate two or more entities in the bankruptcy context. When courts substantively consolidate two entities, they treat the assets and liabilities of each as belonging to a single entity.

347 F.3d at 85—86.

The *Nesbit* Court explained and articulated four "substantive consolidation" factors:

> We adopt an intentionally open-ended, equitable inquiry—which we consider one of federal common law—to determine when substantively to consolidate two entities. While in the bankruptcy context the inquiry focuses primarily on financial entanglement, for Title VII the focus more often rests on the degree of operational entanglement—whether operations of the companies are so united that nominal employees of one company are treated interchangeably with those of another. Relevant operational factors include (1) the degree of unity between the entities with respect to ownership, management (both directors and officers), and business

> functions (*e.g.,* hiring and personnel matters), (2) whether they present themselves as a single company such that third parties dealt with them as one unit, (3) whether a parent company covers the salaries, expenses, or losses of its subsidiary, and (4) whether one entity does business exclusively with the other.

*Id.* at 87—88 (footnotes omitted).

The *Nesbit* Court elaborated further:

> While these factors vary from circuit to circuit, the test at base seeks to determine whether two or more entities affairs' are so interconnected that they collectively caused the alleged discriminatory employment practice. More colloquially, the question is whether the "eggs"—consisting of the ostensibly separate companies—are so scrambled that we decline to unscramble them. We note, however, that substantive consolidation is an equitable remedy and is difficult to achieve.

*Id.* at 86. Although the Third Circuit has yet to apply *Nesbit* to the union context, the Court finds it appropriate to do so here.[9]

A body of caselaw from the Eastern District of Pennsylvania reflects a liberal approach to pleading an integrated enterprise. "Due to the fact-intensive nature of the integrated enterprise test, 'courts [that] have addressed the liability of a parent corporation in the context of employment discrimination ... have [typically] declined to dismiss the corporate parent at the Rule 12(b)(6) stage.'" *Kern v. Phoenixville Hosp., LLC*, 342 F.R.D. 324, 330 (E.D. Pa. 2022) (alterations in original) (quoting *DeLa Cruz v. Piccari Press*, 521 F. Supp. 2d 424, 430 (E.D. Pa. 2007)); *see also DeLa Cruz*, 521 F. Supp. 2d at 431 ("[T]he overall weight of the case law favors giving [plaintiff] the opportunity to conduct discovery before determining whether [the parent company] exercised insufficient control to hold [it] liable for the acts of its subsidiary ….").

---

[9] Because the parties agree that *Nesbit* should apply in this context, the Court will use that test. *Cf. Gorey v. Carpenters Joint Apprentice Comm.*, Civil Action No. 08–5993, 2010 WL 1718288, at * 5 n.3 (E.D. Pa. Apr. 27, 2010) (applying *Nesbit* to the issue of whether two entities were a single employer for administrative-exhaustion purposes based on the parties' agreement, while acknowledging that other tests could apply).

Because the integrated-enterprise inquiry is so fact-intensive, these courts are willing to favorably construe allegations that might otherwise appear to be mere legal conclusions not entitled to consideration. For example, in *DeLa Cruz*, the plaintiff referenced the four factors of the NLRB test in his complaint, but "failed to plead any other supporting facts."[10] *Id.* at 430. The *DeLa Cruz* court grappled with whether this "succinct set of allegations" should be understood as a set of mere "legal conclusions," or instead "as setting forth the bare facts necessary to demonstrate [the parent company's] alleged liability." *Id.* Ultimately, the court held that those allegations were sufficient to allow the plaintiff to conduct discovery as to the parent company's degree of control over its subsidiary. *Id.* at 431; *see also Anderson v. Finley Catering Co.*, 218 F. Supp. 3d 417, 422—23 (E.D. Pa. 2016) (refusing to dismiss complaint where plaintiff did not plead specific facts to support the *Nesbit* factors, but recited the elements of the NLRB test with no other factual allegations); *cf. Graves v. Lowery*, 117 F.3d 723, 729 (3d Cir. 1997) ("[T]he precise contours of an employment relationship can only be established by a careful factual inquiry."). *But see, e.g.*, *Taylor v. Bronx Parent Hous. Network*, 1:21-cv-04890 (JLR), 2023 WL 3996620, at *4 (S.D.N.Y June 14, 2023) (holding that plaintiff failed to sufficiently plead an integrated-enterprise theory where she effectively recited the elements of the NLRB test).

The Court largely concurs with these nonprecedential decisions from the Eastern District of Pennsylvania. Fleshing out an integrated-enterprise theory before discovery presents an obvious difficulty for plaintiffs, as the "operational entanglement" inquiry required by *Nesbit* brings into

---

[10] The plaintiff alleged that "because of their interrelation of operations, common ownership or management, centralized control of labor relations, common ownership or financial controls, and other factors, Defendants Piccari Press, Inc., Defendant Consolidated Graphics, Inc., and Tursack, Inc. ... are sufficiently interrelated and integrated in their activities, labor relations, ownership and management that they may be treated as a single employer of Plaintiff for purposes of the instant action." *Id.* at 429 (citation omitted).

play various categories of information—including financial records and hiring policies—that would otherwise be inaccessible. Furthermore, the fact that these cases do not deal with unions is insignificant. A plaintiff is faced with the same practical barriers in this context as they are in the corporate parent-subsidiary context.

Turning to the sufficiency of the Amended Complaint, the first two routes from *Nesbit* are not implicated here. DiCaprio has not alleged that Local 37 or the International Union split up to evade Title VII liability. Nor does she allege that the International Union directed Local 37 to engage in discrimination. Only the third route—substantive consolidation—is at issue. Ultimately, DiCaprio has alleged enough facts to make her substantive-consolidation theory plausible.

Let's start with the last three substantive-consolidation factors. *Nesbit*, 347 F.3d at 87. DiCaprio has not alleged that Local 37 and the International Union present themselves as a single entity such that third parties treat them as one unit. She has not alleged that the International Union pays the salaries of Local 37's employees, or any of its losses and expenses. Finally, she has not alleged that Local 37 and the International Union do business exclusively with each other.

Crucially, DiCaprio has alleged facts with respect to the first factor—unity of "ownership, management (both directors and officers), and business functions (*e.g.*, hiring and personnel matters)." *Id.* While DiCaprio has not alleged that Local 37 and the International Union have any overlap in terms of management and ownership, she has alleged that the International Union "regularly sends representatives to Local No. 37's office, oversees its operations, participates in its investigations, and governs its status as a local chapter of the [Intern]ational Union." (ECF No. 16, ¶ 39). While these allegations might appear to be legal conclusions not entitled to consideration, *see Baraka*, 481 F.3d at 195, the pleading philosophy articulated by our sister court

counsels against that understanding in this context, *see, e.g.*, *Anderson*, 218 F. Supp. 3d at 422—23.

But DiCaprio's allegations do not end there. She also alleges that the International Union maintains a "Statement of Personal and Professional Standards of Conduct for Officers" which binds Local 37. (ECF No. 16, ¶ 40). This speaks to oversight of personnel matters. Finally, DiCaprio references a variety of provisions in the International Union's constitution, all of which speak to the potential for the International Union's financial and operational oversight over Local 37. (*E.g.*, *id.* ¶ 41) ("The [Intern]ational Union exercises administrative, operational, and financial control over Local No. 37 by … governing the supervision of Local No. 37's officers and their conduct … [and] retaining authority to bring, hear, and decide charges against Local No. 37's officers and members ….").

Whatever the ultimate legal significance of these facts might be, DiCaprio has plausibly alleged a degree of operational entanglement between Local 37 and the International Union that would support her integrated-enterprise theory. However, because DiCaprio does not allege that the International Union—either individually or in combination with Local 37—satisfies the employee-numerosity requirement, her claims will be dismissed without prejudice, and she will be given leave to amend.

### B. DiCaprio's Claims Against the International Union Will Be Dismissed for Failure to Comply with Administrative-Exhaustion Requirements.

The Court will dismiss DiCaprio's claims against the International Union because DiCaprio failed to exhaust her administrative remedies.

Both Title VII and the PHRA require the exhaustion of administrative remedies prior to the filing of a lawsuit.[11] *See* 42 U.S.C. § 2000e-5(b), (f)(1); 43 P.S. §§ 959, 962; *see also Burgh v. Borough Council of Montrose*, 251 F.3d 465, 469 (3d Cir. 2001); *Bailey v. Storlazzi*, 729 A.2d 1206, 1214 (Pa. Super. Ct. 1999). To do so, a complainant must file a charge of discrimination with the EEOC and the PHRC. *See Burgh*, 251 F.3d at 469, 471. That charge must be filed with the PHRC within one hundred eighty days of the last discriminatory act, *see* 43 P.S. § 959(h), and with the EEOC within three hundred days of the last discriminatory act (so long as the charge was properly cross-filed with the state agency), *see* 42 U.S.C. § 2000e-5(e)(1). A particular claim is deemed exhausted if it is "fairly within the scope of [1] the prior EEOC complaint, or [2] the investigation arising therefrom." *Simko v. U.S. Steel Corp.*, 992 F.3d 198, 207 (3d Cir. 2021) (quoting *Waiters v. Parsons*, 729 F.2d 233, 237 (3d Cir. 1984)).[12] This is a "highly fact specific" inquiry, and courts must "careful[ly] examin[e] … the nature of the relevant claims." *Id.*

"The purpose of requiring an aggrieved party to resort first to the EEOC is twofold: to give notice to the charged party and provide an avenue for voluntary compliance without resort to litigation." *Glus v. G. C. Murphy Co.*, 562 F.2d 880, 888 (3d Cir. 1977). Yet failure to name a defendant in an administrative charge is not necessarily fatal. The exception to this rule took shape

---

[11] The Court considers the Title VII and PHRA claims together. *See Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 n.5 (3d Cir. 2006) ("We construe Title VII and the PHRA consistently."); *Burgh v. Borough Council of Montrose*, 251 F.3d 465, 469 (3d Cir. 2001) ("The analysis of [Title VII and PHRA] claims is identical."); *Bailey v. Storlazzi*, 729 A.2d 1206, 1211 n.6 (Pa. Super. Ct. 1999) ("The PHRA is generally applied in accordance with Title VII.").

[12] Though *Simko* involved a claim under the Americans with Disabilities Act ("ADA"), that statute expressly incorporates the administrative procedures of Title VII, including Title VII's exhaustion requirement. *See* 42 U.S.C. §§ 12117(a), 2000e-5; *see also Churchill v. Star Enters.*, 183 F.3d 184, 190 (3d Cir. 1999).

in *Glus*, where the Third Circuit articulated four factors for courts to consider in deciding whether a plaintiff's failure to name a party in their administrative charge should be excused:

> Factors which we believe the district court should look to are 1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint; 2) whether, under the circumstances, the interests of a named are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings; 3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party; 4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party. Consideration of these factors should be initially in the hands of the district court. The goal of conciliation without resort to the already overburdened federal courts is of great importance and should not be lost. However, equally important is the availability of complete redress of legitimate grievances without undue encumbrance by procedural requirements especially when demanding full and technical compliance would have no relation to the purposes for requiring those procedures in the first instance. In our view the district court should evaluate the failure to name the party before the EEOC by consulting the four factors discussed supra.

*Id.* The test is "not a mechanical one; no single factor is decisive. Instead each factor should be evaluated in light of the statutory purposes of Title VII and the interests of both parties." *Glus v. G .C. Murphy Co.*, 629 F.2d 248, 251 (3d Cir. 1980), *vacated on other grounds sub nom.*, *Retail, Wholesale & Dep't Store Union, AFL-CIO v. G. C. Murphy Co.*, 451 U.S. 935 (1981) (mem.).

In *Schafer v. Board of Public Education of the School District of Pittsburgh, Pa.*, the Third Circuit recognized another exception to the exhaustion requirement "when the unnamed party received notice and when there is a shared commonality of interest with the named party." 903 F.2d 243, 252 (3d Cir. 1990). The *Schafer* test represents a "refine[ment]" of the *Glus* factors. *Jankowski v. Fanelli Bros. Trucking Co.*, Civil Action No. 3:CV–13–2593, 2014 WL 690861, at *4 (M.D. Pa. Feb. 24, 2014); *see also Dixon v. Phila. Hous. Auth.*, 43 F. Supp. 2d 543, 546 (E.D. Pa. 1999) (referring to *Schafer* as a "shorthand version" of the *Glus* test). Courts typically go on

to analyze the *Glus* factors even if the plaintiff cannot satisfy the *Schafer* standard. *See, e.g.*, *Jankowski*, 2014 WL 690861, at *8.

The notice requirement often turns on whether a party who is unnamed in the *caption* of the charge is otherwise referenced with specificity in the *body* of the charge. *See, e.g.*, *Bower v. Valley Farms, LLC*, CIVIL ACTION NO. 4:25-CV-00089, 2025 WL 1872492, at *3 (M.D. Pa. July 7, 2025) ("Courts in this district have generally held that an administrative charge must reference defendants and their actions with enough specificity to put the defendants on notice of their potential personal liability."). Courts in the Third Circuit disagree on whether a party can rely on *Glus/Schafer* when they fail to name a defendant in both the caption *and* the body of a charge. *See id.* (collecting cases). Some courts have found that actual notice of a charge is enough to excuse a failure to name *and* reference a defendant. *See id.* ("Courts should dismiss a PHRA claim where the administrative charge fails to reference the defendant *unless the complaint alleges the defendant was informed of their potential liability prior to the plaintiff filing the administrative charge*." (emphasis added)); *Nelson v. Great Lakes Behav. Rsch. Inst., Inc.*, 2:23-CV-01742-CCW, 2025 WL 2192932, at *5 (W.D. Pa. Aug. 1, 2025) (same). The relevant "notice" is notice at the time the charge is filed with the EEOC. *See EEOC v. Geisinger Health*, CIVIL ACTION NO. 21-4294-KSM, 2025 WL 938622, at *15 (E.D. Pa. Mar. 27, 2025).

Courts have found a commonality of interest "where the party named in an EEOC charge and an unnamed party 'were one and the same for purposes of identifying a respondent and participation in the administrative proceedings.'" *Nelson*, 2025 WL 2192932, at *6 (quoting *Urey v. E. Hempfield Twp.*, No. CIV.A. 08-5346, 2009 WL 561664, at *4 (E.D. Pa. Mar. 4, 2009)); *see also Concha v. Perfecseal, Inc.*, Civil Action No. 13–5709, 2014 WL 4634965, at *2 (E.D. Pa.

Sep. 15, 2014) ("As the parent company, Bemis' interests are similar and aligned with those of Perfecseal.").

Here, the Court's analysis is complicated by the fact that none of the parties attached DiCaprio's administrative charges as exhibits to any of their filings. Normally, courts consider those documents at this stage of the litigation because they are "integral to or explicitly relied upon in the complaint." *Nelson*, 2025 WL 2192932, at *2 n.2 (quoting *Mator v. Wesco Distrib., Inc.*, 102 F.4th 172, 178 (3d Cir. 2024)). The only exhibit available to the Court to aid in applying *Glus/Schafer* is the RTS Notice issued by the EEOC to DiCaprio.[13] (ECF No. 16-1). Thus, the dispute boils down to whether DiCaprio has plausibly alleged—based on the Amended Complaint and the RTS Notice—that the International Union was named in the bodies of the administrative charges with enough specificity to put it on notice of its potential liability or was otherwise informed of its potential liability prior to DiCaprio's administrative filings.

DiCaprio cannot successfully invoke *Schafer* to excuse her failure to name the International Union. As for notice, the RTS Notice suggests that the International Union was not named in the caption of DiCaprio's EEOC charge, as Local 37 is the only named party. (ECF No. 16-1). Because the Court is unable to review the administrative charges, it is unclear to what extent—if at all—the International Union was named in or referenced in the bodies of the charges. The Amended Complaint sheds no light on this, but the parties' briefing seems to agree that the International Union was also omitted from the bodies of the administrative charges. (*See* ECF No.

[13] "A court may consider … exhibits attached to the complaint … without converting the motion into one for summary judgment." *Wise v. United Parcel Serv., Inc.*, Civil No. 1:18-cv-01989-SHR, 2019 WL 1896605, at *1 n.1 (M.D. Pa. Apr. 29, 2019). Here, DiCaprio attached the RTS Notice to her original complaint, (ECF No. 1-1), and her Amended Complaint, (ECF No. 16-1).

36, p. 7); (ECF No. 40, p. 6)[14]; (ECF No. 42, p. 2). Assuming that the International Union was referenced in the bodies of the charges in some way, the Court is unable to draw any inferences in DiCaprio's favor as to whether those references were specific enough to apprise the International Union of its potential liability. *See Bower*, 2025 WL 1872492, at *3. Some courts in this circuit would find that fatal to DiCaprio's attempt to invoke *Glus/Schafer*, although the Court will conduct a full analysis here. *See, e.g.*, *Hess v. Twp. of Saint Thomas*, No. 1:23cv544, 2024 WL 1333371, at *5 (M.D. Pa. Mar. 28, 2024) ("[P]laintiff failed to name the individual defendants as respondents in his PHRC complaint and did not mention them in his allegations there. *As a matter of law*, the individual defendants were deprived of notice that plaintiff would pursue claims against them in their individual capacities in this case." (emphasis added)).

Finally, nothing in the Amended Complaint suggests that the International Union was aware of its potential liability prior to the filing of DiCaprio's charges. *See Bower*, 2025 WL 1872492, at *3. As discussed above, DiCaprio's briefing does not meaningfully address these issues or elaborate on why the Court should infer any sort of notice from the allegations in the Amended Complaint.

---

[14] DiCaprio's brief is vague on this point, but several facts suggest that she did not discuss the role of the International Union in her administrative charges with any specificity, if at all. For one, she does not discuss the notice aspect of *Schafer*, which would logically have required a discussion of the content of her administrative charges. She also cites cases where courts have excused the failure to name a defendant in the caption *and* the body of an administrative charge. (ECF No. 40, p. 6). She also appears to quote a portion of one of her administrative charges without any accompanying citation, stating that "[p]laintiff filed her charge of discrimination asserting that she experienced 'egregious sexual harassment in the workplace' and that she 'made reports to *Respondent* and her reports went unaddressed.'" (*Id.* at 6—7) (emphasis added). Because the term "respondent" is unique to the EEOC context, and because Local 37 was the only named respondent in the RTS Notice, (ECF No. 16-1), the only evidence the Court has about the content of the administrative charges suggests that the International Union's role was actually *downplayed*. This is all the more puzzling considering that the only reports DiCaprio ever made about Porter were directed to the International Union. (ECF No. 16, ¶¶ 58—63, 71—72).

Although a lack of notice to the unnamed party defeats a plaintiff's ability to rely on *Schafer*, *see id.* at *5, the Court notes that DiCaprio has plausibly alleged a commonality of interest between Local 37 and the International Union. This portion of the *Schafer* test is essentially the same as the second *Glus* factor, *see Hills v. Borough of Colwyn*, 978 F. Supp. 2d 469, 481—82 (E.D. Pa. 2013), which asks whether the "interests of [the] named are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings," *Glus*, 562 F.2d at 888. The same facts which support DiCaprio's integrated-enterprise theory arguably apply here as well. (*See* ECF No. 16, ¶¶ 39—41) (describing the International Union's visits to Local 37's office, personnel standards, and a variety of constitutional mechanisms that allow for the oversight of Local 37 and its personnel). Discovery may ultimately reveal that the various control mechanisms alluded to by DiCaprio do not reflect any actual operational entanglement. But at this stage, she has pled enough to show a commonality of interest.

Similarly, DiCaprio's failure to exhaust cannot be excused under the *Glus* factors. DiCaprio submits that the first factor favors the International Union, as she knew that Kujawa and Vasey were affiliated with the International Union when she filed her administrative charges. (ECF No. 40, p. 6). As discussed in relation to the notice aspect of *Schafer*, the second *Glus* factor favors DiCaprio. The third *Glus* factor—prejudice—favors the International Union, as prejudice is often presumed. *See, e.g.*, *Wise*, 2019 WL 1896605, at *4 ("[B]ecause it was not named in the dual-filed charge, Local 776 was prejudiced by an inability to defend itself from the allegations at the administrative level and to compromise voluntarily prior to litigation.").

The fourth *Glus* factor favors the International Union. This factor turns on whether the International Union conveyed to DiCaprio that her relationship with the International Union was to be through Local 37. DiCaprio argues this factor as follows:

> [T]he [Intern]ational Union … represented to Plaintiff that Plaintiff's relationship with the [Intern]ational Union was to be through the Local Union, as when Plaintiff attempted to reference the [Intern]ational Union's Collective Bargaining Agreement sections on 'human rights' and 'sexual harassment,' Vasey and Kujawa informed Plaintiff that because she was not a union member, that she had 'no rights,' implying that the [Intern]ational Union would take no further steps to protect her despite previously stating the opposite.

(ECF No. 40, p. 7). It is unclear how this exchange favors DiCaprio, as DiCaprio's perception that the International Union would not protect her says nothing about whether her relationship with the International Union would be mediated through Local 37. The point of this *Glus* factor is to excuse a plaintiff's failure to name a party in the administrative charge where that failure was induced by the unnamed party's representations. DiCaprio has not alleged anything to show that this is the case.

On the whole, the *Glus* factors favor the International Union. While the second factor—the commonality of interest between Local 37 and the International Union—arguably favors DiCaprio, no one factor is decisive. *Glus*, 629 F.2d at 251. The Court finds the first factor—whether DiCaprio could have ascertained the International Union's role at the time of her administrative filings—to be especially significant in light of the goal of administrative-exhaustion requirements like those in Title VII and the PHRA, which is to "enable formal resolution in advance of any formal proceedings." *Coe v. Pa. State Univ.*, No. 4:14-cv-01818, 2016 WL 1162344, at *6 (M.D. Pa. Mar. 24, 2016); *see also Glus*, 562 F.2d at 888 (requiring the district court to balance "[t]he goal of conciliation without resort to the already overburdened federal courts" with the need for "availability of complete redress of legitimate grievances without undue

encumbrance by procedural requirements especially when demanding full and technical compliance would have no relation to the purposes for requiring those procedures in the first instance"). Despite having deliberately sought recourse from members of the International Union in response to Porter's harassment, DiCaprio seemingly failed to name the International Union in her administrative charges, thereby circumventing Congress's attempt to resolve employment disputes without invoking the judicial process.

In conclusion, DiCaprio cannot successfully invoke *Glus/Schafer*. Because her failure to exhaust administrative remedies is unexcused, her claims against the International Union will be dismissed without prejudice. However, given the dearth of information as to DiCaprio's administrative charges and the circumstances surrounding their filing, DiCaprio will be given leave to amend her Amended Complaint with respect to the issue of whether *Glus/Schafer* can excuse her failure to name the International Union.

**C. Even If DiCaprio's Failure to Name the International Union Is Excused, Her Amended Complaint Is Untimely Against the International Union Because She Failed to Sue the International Union Within Ninety Days of Receiving the RTS Notice, and the Doctrine of Relation Back Does Not Apply.**

Even if DiCaprio's failure to exhaust her administrative remedies against the International Union is excused, she faces an additional hurdle: she did not sue the International Union within the ninety-day window provided for in the RTS Notice. (ECF No. 16-1); 42 U.S.C. § 2000e-5(f)(1) (providing a Title VII claimant with ninety days to sue after receiving a right-to-sue notice from the EEOC).

DiCaprio filed her original pleading naming Local 37 as the sole defendant on November 18, 2025. (ECF No. 1). This was within the ninety-day period specified in the RTS Notice, which began to run on August 29, 2025, the date DiCaprio received the RTS Notice. (ECF No. 16-1); (ECF No. 40, p. 8). DiCaprio then filed her Amended Complaint naming the International Union

as a defendant on February 11, 2026. (ECF No. 16). This was outside the ninety-day window, which means that DiCaprio's Amended Complaint is untimely *unless* it relates back to the November 18, 2025, filing date of her original pleading. The parties dispute whether this doctrine applies, specifically whether the International Union "knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." Fed. R. Civ. P. 15(c)(1)(C)(ii).

The doctrine of relation back embodied in Federal Rule of Civil Procedure 15(c) "can ameliorate the running of the statute of limitations on a claim by making the amended claim relate back to the original, timely filed complaint." *Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 193 (3d Cir. 2001). Federal Rule of Civil Procedure 15(c) provides:

> **(c) Relation Back of Amendments.**
>
> **(1)** ***When an Amendment Relates Back.*** An amendment to a pleading relates back to the date of the original pleading when:
>
> **(A)** the law that provides the applicable statute of limitations allows relation back;
>
> **(B)** the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading; or
>
> **(C)** the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
>
> **(i)** received such notice of the action that it will not be prejudiced in defending on the merits; and
>
> **(ii)** knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c). The ninety-day window established by 42 U.S.C. § 2000e-5(f)(1) operates as a statute of limitations for purposes of the relation-back doctrine. *See, e.g.*, *Devitt v. Sanofi-Aventis US, LLC*, 793 F. Supp. 3d 245, 253—55 (D. Mass. 2025).

Here, DiCaprio is attempting to add the International Union as a defendant in her Amended Complaint, which means she must meet the three requirements set forth in Federal Rule of Civil Procedure 15(c)(1)(C)(i)—(ii) for her claim against the International Union to be timely. The first two requirements are not at issue. First, her claims against the International Union arise out of the same "conduct, transaction, or occurrence" that underlies her claims against Local 37, namely, Porter's sexual harassment. Fed. R. Civ. P. 15(c)(1)(B). Second, the International Union received notice of the action within the ninety-day window provided for by Federal Rule of Civil Procedure 4(m), Fed. R. Civ. P. 15(c)(1)(C)(i), since DiCaprio filed her original pleading on November 18, 2025, and the International Union was served with the Amended Complaint on February 12, 2026, (ECF No. 1); (ECF No. 22).

The third requirement is where DiCaprio's relation-back theory fails. She has not shown any sort of mistake on her part that the International Union would have been aware of. Fed. R. Civ. P. 15(c)(1)(C)(ii). In her brief, DiCaprio asserts in conclusory fashion that she would have filed claims against the International Union initially "but for a mistake in the proper defendants' identities." (ECF No. 40, p. 9). It is unclear what this mistake might have been, given that mere sentences earlier DiCaprio asserts that she told Kujawa—who was affiliated with the International Union—that she planned to sue *both* Local 37 and the International Union. (*Id.*).

Nevertheless, the Court will allow leave to amend to address the mistake issue. DiCaprio should be cognizant that the International Union's presence as a defendant in this lawsuit is

contingent upon both the excusal of her failure to exhaust administrative remedies and her ability to truthfully allege a mistake of which the International Union was aware.

### D. The Court Will Decline to Exercise Supplemental Jurisdiction over DiCaprio's Remaining State-Law Claims.

When a district court has supplemental jurisdiction over state-law claims under 28 U.S.C. § 1367(a), it has discretion to exercise or decline to exercise this jurisdiction. *De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301, 311 (3d Cir. 2003). The statute provides that a district court "may decline to exercise supplemental jurisdiction" if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "[W]here the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995). Because DiCaprio's federal-law claims will be dismissed, the Court declines to exercise supplemental jurisdiction over her state-law claims. Those claims are brought under the PHRA and the Pennsylvania common law of battery, assault, and negligent supervision. If DiCaprio can successfully amend her pleading, the Court will revisit the propriety of exercising supplemental jurisdiction over these claims, and the parties can raise their arguments as to those claims at that time.

## IV. CONCLUSION

Because DiCaprio has failed to plausibly allege that Local 37 satisfies Title VII's employee-numerosity requirement, her Title VII claim against Local 37 will be dismissed without prejudice. DiCaprio has plausibly alleged that the employees of Local 37 and the International Union (whoever they might be) can be combined under an integrated-enterprise theory for purposes of meeting that requirement, but her failure to allege that the International Union satisfies

that requirement—either individually or in combination with Local 37—still necessitates dismissal.

DiCaprio's Title VII claim against the International Union will also be dismissed without prejudice. First, DiCaprio seemingly failed to name the International Union in her administrative charge with the EEOC. Based on the facts alleged in the Amended Complaint, no exception applies to excuse that failure. Second, and even if DiCaprio's failure to name the International Union in her administrative charge is excused, she filed her Amended Complaint outside the ninety-day window provided for in the RTS Notice. This makes her claim against the International Union untimely. Based on the facts currently before the Court, the doctrine of relation back does not apply.

Because DiCaprio's federal-law claims will be dismissed, the Court will decline to exercise supplemental jurisdiction over her state-law claims unless and until she cures these various defects in a second amended pleading. An order of court will follow.

BY THE COURT:

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

11/19/26
Dated